FILED
2011 Aug-19  AM 10:20
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

|  |  |
|---|---|
| JOHNSON CONTROLS, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MARK DENGATE and MCQUAY INTERNATIONAL a/k/a DAIKIN MCQUAY, | ) ) ) ) |
| Defendants. | ) ) ) ) |

7:11-cv-2135-LSC

MEMORANDUM OPINION

## I.    Introduction.

Pending is Plaintiff Johnson Controls, Inc.'s ("Johnson Controls") amended motion for a preliminary injunction, filed August 2, 2011. (Doc. 34.) Johnson Controls seeks to enjoin a former employee and his new employer from breaching his employment agreement with Johnson Controls by soliciting its customers and using information he learned while employed at Johnson Controls to benefit his new employer. Defendants Mark Dengate

("Dengate"), the former employee, and McQuay International ("McQuay"), the new employer, contend primarily that Johnson Controls has neither established a substantial likelihood of success nor an irreparable injury, rendering an injunction inappropriate.

The Court heard oral argument and took evidence over two days, July 11-12, 2011. After considering the presented evidence and arguments, the Court GRANTS certain relief sought in the motion.

## II.    Facts.

In 1999, a global heating, ventilating, and air-conditioning provider, York International ("York"), hired Dengate to be a sales account executive in Birmingham, Alabama. York made him responsible for a sales territory primarily covering Birmingham and Montgomery, Alabama.

Around that time, the United States government began implementing specific security requirements for future U.S. embassies. The U.S. wanted to protect against bio-chemical weapon use. York, working primarily with two other companies, Camfil Farr and Flander's, developed a filtration unit that York could integrate into its air handling unit, part of an air-conditioning system. The resulting product is referred to as an embassy air

handling unit. York received its first order for an embassy air handling unit in 2000.

In 2003, Dengate became responsible for the Caddell Construction Company, Inc., ("Caddell") account. Caddell is a construction company based in Montgomery, Alabama, that builds United States embassies and consulates under government contracts around the world. Caddell became a major customer of York.

In early 2006, Plaintiff Johnson Controls acquired York. Johnson Controls dates to the 19th century and was founded by the inventor of the electric thermostats, Professor Warren Johnson. A building controls company, Johnson engineers, manufactures, and installs heating, ventilation, air-conditioning, lighting, and fire safety equipment. Because of the purchase, Caddell became one of Johnson Controls' most profitable clients in North America.

Through York, Johnson controls targeted the market in embassy air handling units, initially competing solely against Trane, Inc. In the last nine or so years—until Defendant McQuay's entry into the market—Johnson Controls has provided the embassy air handling units for all but one of

Caddell's embassy construction projects.

From around 2004 through 2008, Dengate spent half or more of his time servicing Caddell.  This investment of time generated three-quarters of Dengate's commissions, making him one of Johnson Controls' highest paid sales account executives. Dengate cultivated a relationship with his contact people at Caddell, going on several hunting and fishing trips with them. This included trips with Brian Coltey, who made embassy purchasing decisions on Caddell's behalf. (Doc. 22-1 at 15.)

In mid-2008, Dengate expressed his interest in a management position with Johnson Controls, ultimately accepting a position as  sales manager in Nashville, Tennessee. On June 23, 2008, he executed an employment agreement, an agreement identical to one he had executed in Birmingham the previous year, except that the Nashville branch of Johnson Controls ratified it. In the employment agreement, he promises, in particular, not to compete with Johnson Controls and not to disclose confidential information about Johnson Controls' business:

> NON-COMPETITION. For one year following the date of termination I will not perform services directly or indirectly in or for a business competitive with

Johnson Controls, with respect to; 1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 9 months of employment received or were about to receive proposals from any employee of Johnson Controls with whom I had contact. The covenant not to unfairly compete will not apply to contractors or subcontractors with whom Johnson Controls has existing or proposed business.

. . .

CONFIDENTIALITY. For a period corresponding to the term of employment and thereafter, as long as the information remains confidential or proprietary, I shall not disclose to others, copy of use, except as authorized by Johnson Controls, any confidential or proprietary information of Johnson Controls or its subsidiaries and affiliates compromising any data or information, however embodied, acquired or created, concerning any aspect of the business of Johnson Controls that I may acquire or originate during my employment. This clause is not to be construed as prohibiting the use of my trade and professional skills so long as such does not violated confidential or proprietary information. Upon termination of my employment, I will surrender to Johnson Controls any and all documents that I have in my possession incorporating any such confidential or proprietary information, including all copies thereof whether in human or machine readable form.

(Doc. 1-1 at 1-2.)

While in Nashville, Dengate conversed with Steve Newton, who had been assigned Dengate's old accounts back in Birmingham.  (Doc. 22-4 at 14.) Newton had been handling the account of another embassy builder, B.L. Harbert International. Dengate and Newton discussed pending embassy projects. Dengate remained interested in the projects and the embassy market: generally, which projects were available in the market, how profitable the projects were; specifically, how Johnson Controls' projects with Caddell were progressing, what projects Caddell had received from the government, how Johnson Controls' relationship remained with Caddell, how to handle certain personalities at Caddell, and how Johnson Controls' pricing levels and margins were for upcoming bids. (Doc. 22-4 at 16-17.)

Dengate did not prosper in his new position. Unable to maintain sales numbers and to retain sufficient sales associates, Dengate contacted Johnson Controls' regional vice-president, Steve Stanitzke, to discuss other available positions. Stanitzke told Dengate about an open position in Florida; however, Dengate was not interested in moving to Florida.

Meanwhile, Caddell had won five embassy construction projects, BB, MEG, DD, SDDR, and KA, from the U.S. Government. (Doc. 22-14 at 17-18.)

Caddell then sought bids for the embassy air handling units needed for these projects. According to Newton, he and Dengate discussed the specifics of DD and BB. Johnson Controls won DD and MEG. Trane won BB however, and this was a subject of discussion between Newton and Dengate. Dengate and Newton also discussed the SDDR project, specifically about Johnson Controls' offer. (Doc. 22-4 at 33.) They discussed the margins on Newton's recent projects (taking a lower margin—less profit—enables a company to lower its bid price). (Doc. 22-4 at 33-34.) As Dengate testified, bid pricing is "very important." (Doc. 22-1 at 58.)

Dengate resigned on February 4, 2011.

After leaving Johnson Controls, Dengate went to work for McQuay, one of Johnson Controls' competitors. At the time, McQuay did not have a presence in Birmingham. Dengate opened a Birmingham sales office, which covered basically the same area as Dengate had for Johnson Controls. Prior to this time, McQuay had never bid on an embassy air handling unit directly. (Doc. 26-3 at 30.) When McQuay hired Dengate, it reviewed a copy of Dengate's employment agreement. (Doc. 22-5 at 15.)

After starting with McQuay, Dengate began calling on the contacts he

had established while working for Johnson Controls. After meeting with Brian Coltey of Caddell, Dengate began putting together an embassy air handling unit on behalf of his new employer, McQuay. Dengate contacted Camfil Farr to inquire about bio-chemical filtration. Dengate  dealt with contacts at Camfil Farr that he knew from his Johnson Controls employment. (Doc. 22-1 at 36.) This process involved both securing bio-chemical filtration from Camfil Farr and arranging a manufacturer to integrate the filtration into its air handling unit. McQuay would then sell the package, an embassy air handling unit. Dengate informed Coltey in April 2011, that McQuay would be able to produce an embassy air handling unit to meet their needs. (Doc. 22-7 at 7.)

In May 2011, Johnson Controls submitted a bid to provide Caddell with an embassy air handling unit for the SDDR project, a job worth around two million dollars. Later that month, Caddell informed Johnson Controls that it planned to award the SDDR project to McQuay. Stanitzke then attempted to find out why Johnson Controls' bid failed. He met with Caddell in June 2011.

In that meeting, Caddell informed Johnson Controls of Dengate's role

in securing the business for McQuay. (Doc. 22-2 at 72.) Two days after the meeting, Johnson Controls sent Dengate and McQuay letters demanding that they not perform any project for Caddell because of Dengate's employment agreement with Johnson Controls. Neither Dengate nor McQuay responded. Johnson Controls then filed the present suit on June 17, 2011.

Following the two-day hearing on July 11-12, 2011, Defendants filed a Rule 12(b)(7) motion to dismiss (Doc. 24) Johnson Controls' amended complaint (Doc. 19) for failure to join Caddell as a necessary party. This Court found that Caddell had an interest in the letter of intent it had sent regarding the SDDR contract, and accordingly gave Johnson Controls seven days to serve process on Caddell. (Doc. 33.) Rather than doing so, Johnson Controls voluntarily withdrew its claim for injunctive relief with respect to the SDDR project. (Doc. 34.)

On August 8, 2011, McQuay received a purchase agreement from Caddell, indicating that McQuay had been selected as the supplier for the KA project. Defendants then filed a renewed motion to dismiss (Doc. 39) on the basis that Caddell was once again a necessary party, due to the interest created by the purchase agreement for the KA contract. After considering

the arguments of Johnson Controls in its response to the motion to dismiss (Doc. 40), the Court found that Caddell was a necessary party to the claim for injunctive relief regarding the KA contract, and gave Johnson Controls the three days it had requested to serve process on Caddell. (Doc. 42.) Caddell was served on August 15, 2011 (Doc. 43), but after discussing matters with McQuay, Caddell withdrew its purchase order, and stated its intent to refrain from "mak[ing] a commitment to anyone for approximately two weeks" with regard to the KA project. (Doc. 45-1.) Because there is no longer a letter of intent or purchase order with McQuay for the KA project, Caddell's presence as a party is not required at this time. The Court accordingly excludes from its consideration only the SDDR project, for which Johnson Controls' claim for injunctive relief has been withdrawn.

## III.   Standard.

Before a district court may issue a preliminary injunction—an extraordinary equitable remedy—the burden is on the moving party to demonstrate (1) that it has a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to it outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) that, if issued, the injunction would not be adverse to the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). "These four considerations are factors to be balanced, not prerequisites that must be met." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citations omitted). "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits." *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd*, 557 F.3d 1177, 1198 (11th Cir. 2009). The most important factor is the second, requiring irreparable injury. Indeed, showing "irreparable injury is the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).

## IV.  Analysis.

As its basis for injunctive relief against Dengate, Johnson Controls relies on the employment agreement and the Alabama Trade Secrets Act. Ala. Code § 8-27-1. To support injunctive relief against McQuay, Johnson Controls claims that McQuay tortiously interfered with Johnson Controls' business relationships.

A.      Substantial Likelihood of Success on the Merits

1.      Dengate's Employment Agreement

i. Non-Competition Clause

Johnson Controls' first claim against Dengate is for the violation of a

non-competition clause contained in his employment agreement. The

clause, in both the 2007 and 2008 agreements, provided:

> NON-COMPETITION. For one year following the date
> of termination I will not perform services directly or
> indirectly in or for a business competitive with
> Johnson Controls, with respect to; 1) existing
> Johnson Controls customers or potential customers
> served or solicited by me or someone under my
> supervision while I was a Johnson Controls
> employee, and/or 2) potential customers who within
> my last 9 months of employment received or were
> about to receive proposals from any employee of
> Johnson Controls with whom I had contact. The
> covenant not to unfairly compete will not apply to
> contractors or subcontractors with whom Johnson
> Controls has existing or proposed business.

As a threshold matter, the Court must first determine whether the

interpretation of the agreement should be governed by Alabama or

Tennessee state law. "Alabama follows the principle of 'lex loci contractus,'

which states that a contract is governed by the laws of the state where it is

made except where the parties have legally contracted with reference to

the laws of another jurisdiction." *Cherry, Bekaert & Holland v. Brown*, 582

So. 2d 502, 506 (Ala. 1991). The most recent employment agreement

between Johnson Controls and Dengate was executed in Nashville,

Tennessee, and does not specifically invoke the law of any particular state;

thus, "lex loci contractus" would have us look to the law of Tennessee.

Alabama law, however, also provides that this general principle is trumped

under certain circumstances;   where a "fundamental public policy" is

implicated, and "Alabama has a materially greater interest . . . in the

determination of [the]   issue," then "Alabama law will govern the

agreement." *Id.* at 507-08. The Alabama Supreme Court has held that

"Alabama's policy against covenants not to compete," codified in § 8-1-1 of

the Alabama Code,  is an example of such a "fundamental public policy." *Id.*

at 507 (citing *Blalock v. Perfect Subscription Co.*, 458 F. Supp. 123, 127

(S.D. Ala. 1978)). Thus, if the non-compete agreement at issue violates § 8-

1-1,  then Alabama law both controls the agreement and operates to render

it void.

Section 8-1-1(a) provides that "[e]very contract by which anyone is

restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is void to that extent." Subsections (b) and (c) provide limited exceptions to the rule. Defendants contend that Dengate's employment agreement runs afoul of § 8-1-1(a), and does not fit within the exceptions provided for in § 8-1-1(b)-(c), and should therefore be held void. (Doc. 21-5 at 46.) The Court disagrees. In *Ex parte Howell Engineering & Surveying, Inc.*, the Alabama Supreme Court held unambiguously that "a partial restraint of trade is not void under § 8-1-1." 981 So. 2d 422-23 (Ala. 2006). The court expressly overruled a line of cases to the contrary, and endorsed a line of consistent cases as being "the better reasoned." *Id.* at 423. *See also Southeast Cancer Network, P.C. v. DCH Healthcare Authority, Inc.*, 869 So.2d 452 (Ala. 2003). As such, the Court accepts it as well established that a non-compete agreement which effects only a partial restraint of trade does not implicate the ban of § 8-1-1(a), and obviates the need to consider the exceptions of § 8-1-1(b)-(c).

Determining whether a restraint on trade is a mere "partial restraint" requires looking at "the ability of an employee to engage, as a practical matter, in the meaningful pursuit of one's calling." *Ex parte Howell*

*Engineering*, 981 So. 2d at 422 n4. If, practically speaking, the agreement prevents a person from engaging in his vocation, then § 8-1-1 applies. But "[i]f the agreement under attack does not so limit the options of the employee, then it is only a partial restraint of trade not subject to the general rule of § 8-1-1." *Id*.

The agreement in question is limited to preventing Dengate from working for "a business competitive with Johnson Controls," and even then only with respect to two categories of people: existing or potential customers that were served by Dengate or his subordinates, and  those potential customers who had received or were about to receive proposals from an employee of Johnson Controls with whom Dengate had been in contact. (Doc 19-3 at 2.) While still subject to the analysis that follows below, it is clear enough that the non-compete clause at issue does not, practically speaking, prevent Dengate from pursuing in his calling. *See also Tomlinson v. Humana, Inc.*, 495 So. 2d 630 (Ala. 1986)(finding a contract to be only a "partial restraint" and "properly restricted" where it prevented the hiring of a pathologist at hospitals where he had previously been working under the employ of another doctor, but did not prevent him from working

for other hospitals). Thus, the policy embodied in § 8-1-1 does not operate to render the contract provision void, and further analysis of the validity of the clause can proceed.

Following the "lex loci" doctrine of Alabama's choice of law rules, discussed above, the Court next considers the non-compete provision under applicable Tennessee law. It should be noted, however, that Alabama and Tennessee law in this area is substantially the same. *See Consultants & Designers, Inc. v. Butler Service Group, Inc.*, 720 F. 2d 1553, 1557 (11th Cir. 1983) (observing that there is "no significant difference" between the laws of Alabama, Tennessee, and New Jersey in this regard). The touchstone of the analysis is the same for both; either stream requires the Court to "sail into that cherished legal haven, 'Is it reasonable under the circumstances?'" *Id.* Thus, although the discussion below focuses on Tennessee law, the Court is satisfied that the same result would be obtained under Alabama law.

In Tennessee, "[a]s a general rule, restrictive covenants in employment contracts will be enforced if they are reasonable under the particular circumstances." *Central Adjustment Bureau, Inc. v. Ingram* 678 S.W.2d 28, 32-33 (Tenn. 1984). Such agreements are  generally disfavored

and construed in favor of the employee, but are enforceable if the time and territorial limitations are reasonable. *Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W. 3d 674, 678 (Tenn. 2005).

Defendants argue that a lack of consideration renders the contract unenforceable under Tennessee law. (Doc. 36 at 80.) In Tennessee, "[t]he rule of reasonableness applies to consideration as well as to other matters such as territorial and time limitations." *Central Adjustment Bureau*, 768 S.W.2d at 33. Following the 2008 employment agreement, Dengate continued to be employed by Johnson Controls for three years. Tennessee courts have found even less time to be sufficient consideration for a contract not to compete. *See id.* at 35 (finding two years of continued employment before employee voluntarily left to be sufficient consideration), *see also Girtman & Associates, Inc. v. St. Amour*, 2007 WL 1241255 (Tenn. Ct. App. 2007) ("Continued future employment of an at-will employee has been deemed to be sufficient consideration in and of itself to support enforcement of a covenant not to compete."). Other factors supporting the reasonableness of consideration include the fact that Defendants themselves repeatedly characterize Dengate's move to Nashville

in 2008 as a "promotion." (Doc. 21-5 at 18.) Not only was Dengate continuing his employment with Johnson Controls, but was also accepting a new position within the company. *See Central Adjustment Bureau*, 678 S.W. 2d at 33 ("We hold that a covenant signed prior to, contemporaneously with or shortly after employment begins . . . is supported by adequate consideration."). Additionally, Dengate left Johnson Controls voluntarily. *See id.* at 35 ("Another factor affecting reasonableness is the circumstances under which an employee leaves."). Thus, the employment agreement does not fail for insufficiency of consideration.[1]

Evaluating whether the noncompete provision is "reasonable under the particular circumstances," *id.* at 32, requires looking at factors including: "(1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest." *Murfreesboro Medical Clinic*, 166 S.W. 3d at 678. Additionally, the "time and territorial

---

[1] The same result follows under Alabama law, see Corson v. Universal Door Systems, Inc., 596 So. 2d 565, 568 (Ala. 1991) ("[C]ontinued employment and compensation in return for a promise not to compete constitutes consideration.").

limits must be no greater than necessary to protect the business interest of the employer." *Id.*

The first set of these factors support a finding of reasonableness for the non-compete provision at issue. As discussed above, the consideration supporting the agreement is sufficient. The threatened danger to the employer, Johnson Controls, is evident from the two contracts which have already been lost to its competitor as a result of Dengate's employment with McQuay, and the threat of future harm. The economic hardship imposed on Dengate, meanwhile, is relatively slight — the agreement restricts him from employment with a competitor only with respect to customers which Johnson Controls either already had or was actively pursuing, and only for a limited time. Finally, there is certainly a public interest in disfavoring restraints on trade, see *Allright Auto Parks, Inc. v. Berry*, 409 S.W. 2d 361, 363 (Tenn. 1966), but there are competing interests as well. Restrictive covenants can  serve the public interest by encouraging employers to invest in their employees without fear of that investment accruing directly to their competitors. *See Consultants & Designers*, 720 F.2d at 1560 ("[T]he public at large can be expected to gain from the enforcement of this and similar

restrictive covenants to the extent that these covenants encourage optimal investment."). Additionally, this case does not involve the practice of medicine or law, where special policy concerns are at issue, *see Murfreesboro Medical Clinic*, 166 S.W. 3d at 683 (finding that restrictive covenants on "[t]he medical profession, like the legal profession" are "inimical to public policy and unenforceable" on the basis of the special "trust and confidence" involved in such relationships). On balance, these factors counsel a finding of reasonableness.

The requirement of reasonableness with regard to time and territorial limits is more hotly contested between the parties. First, in order to evaluate whether the limitations are "greater than necessary to protect the business interest of the employer," Id. at 678, the Court must examine whether there is a "legitimate business interest." *Hasty v. Rent-A-Driver, Inc.*, 671 S.W. 2d 471, 473 (Tenn. 1984). A business "cannot by contract restrain ordinary competition," there must be "special facts . . . such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer." *Id.* Such interests include "business secrets or other confidential information," or situations

"where the employee closely associates or has repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee." Here, Dengate had knowledge of confidential information, as discussed in the next section. Additionally, Dengate's close association with Johnson Control's suppliers and customers such as Caddell, together with his knowledge, contributed to McQuay's ability to enter and be competitive in a market where it had not previously done business. The unfair advantage indicated by these "special facts" demonstrates the sort of interest "entitled to the protection of a non-competition covenant." *Id.*

The question of whether the restraint on time is greater than necessary to protect this interest is seemingly straightforward. The non-competition clause provides that it is effective "[f]or one year following the date of termination." (Doc. 19-3 at 2.) Defendants, however, contend that enforcing this one-year provision against Dengate would actually amount to an unreasonable four-year restriction, and argue that the one-year provision expired during the "three years Dengate already spent on the sideline." (Doc. 21-5 at 51). The Court finds this argument unpersuasive, and notes that the unpublished opinion which Defendants rely on is factually

distinguishable. *See Scale Reproductions, LLC v. Skinner*, 2007 WL 3086033 (S.D. Ala. 2007). Dengate was continuously employed by Johnson Controls during the three years he allegedly spent "on the sideline," and the non-compete clause seems plainly to refer to a period of one year from the time of Dengate's employment with Johnson Controls. Even if the Court were persuaded by Defendants' arguments, a four-year agreement would still not be per se unreasonable; non-compete agreements of three years and five years have each been held to be reasonable by Tennessee courts on multiple occasions. *See Vantage Technology, LLC v. Cross*, 17 S.W. 3d 637, 648 (Tenn. Ct. App. 1999) (citing cases). A four-year agreement might well be reasonable under these circumstances; the one-year agreement which the contract purports to be certainly is.

Geographic restrictions must be limited such that the territorial limits are "no greater than necessary to protect the business interest of the employer." *Murfreesboro Medical Clinic*, 166 S.W. 3d at 678. Here, there is disagreement between the parties as to what the geographic limitations actually are. Dengate and McQuay contend that geographic limitations should be inferred from the portion of the contract stating where the

agreement was ratified. Thus, for the 2007 agreement which reads "Ratification by Johnson Controls, Inc. - Location:_____", with "Birmingham," handwritten in the blank, the contract would be limited to Birmingham; for the 2008 agreement, with "Nashville" filling the same blank, the contract would be limited to Nashville. Johnson Controls, meanwhile, contends that the geographic limitation is set by reference to its customers; i.e, that for a company with customers across the globe, a geographical restriction would be impractical, so the agreement is instead constrained to prohibiting competition with regard to those particular customers.

Defendants's argument is unconvincing for two reasons. First, the contract itself does not attach any such significance to the location of ratification. It does not appear in the section labeled "NON-COMPETITION," as does the customer-based limitation. Rather, it appears below the space for the employee's name and signature, and accompanies the signature of the Johnson Controls Authorized Representative. Second, reading such a limitation into the contract would be at odds with what the non-competition section actually does provide.  The section is silent as to  territorial limits,

and implying one from the ratification location would  be inconsistent with the stated customer-based limitations.

Defendants concede that Johnson Controls' customer-based limitation is not without precedent, although they maintain that it is inapplicable here. Tennessee courts have recognized a limitation on persons as a reasonable and acceptable substitute for a geographic restriction, *see Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W. 2d 743, 745 (Tenn. Ct. App. 1987)("As the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases.")(citation omitted). In fact, the court in *Bowlin* even noted that "[i]nstead of being fatal, this omission leaves [the employee] great freedom to practice his profession in the same area as the [former employer]." *Id.* Defendants assert that the restricted category of customers in Dengate's agreement with Johnson Controls was "not clearly defined and entirely too broad" under the circumstances here, and that the provision amounts to an "extremely onerous limitation on Mr. Dengate." (Doc 26 at 6-7). Defendants maintain that Tennessee law requires a "specificity of limitation" which is lacking in

the present case. Yet both of the cases cited by defendants appear to involve restrictions which are remarkably similar to Dengate's agreement with Johnson Controls. See *id.* At 745; Hamilton-Ryker Group, LLC v. Keymon, 2010 WL 323057 at 2 (Tenn. App. Ct. 2010). In Bolin, the court went so far as to comment on the *lack* of specific limitations on the clients to whom the contract applied, and went on to impose a limitation of its own. 765 S.W. 2d at 745 ("Although the term 'clients' in the Contract was not specifically limited to present clients, we find that this is the only defendable client interest the Partnership had."). Dengate's agreement with Johnson Controls, in contrast, is limited to "existing customers," and those which Dengate's contacts within Johnson Controls were presently pursuing. Thus, the Court finds that the customer-based limitation in Dengate's employment agreement with Johnson Controls is an adequate substitute for a geographic limitation. Further, by limiting the agreement to existing customers and those Dengate and his associates were pursuing, it does constitute a geographical limitation — a narrow limitation marked by the location of those customers.

Having considered the validity of the non-compete agreement, the

Court concludes that there is a substantial likelihood of it being enforceable against Dengate. The facts supporting a violation of the one-year non-compete clause are uncontroverted. Dengate resigned on February 4, 2011. Defendants themselves state that "Dengate was soliciting and securing accounts with JCI's customers as early as early as March" of 2011, the month after his departure from Johnson Controls. Accordingly, the Court finds that there is a substantial likelihood of Johnson Controls succeeding on its claim against Dengate for violation of the non-competition provision.

### ii. Confidential Information

Johnson Controls also seeks relief against Dengate for violating his employment agreement by misappropriating Johnson Controls' confidential information. A breach of contract claim requires a plaintiff to prove that a valid contract exists, that the plaintiff has performed its obligations while the defendant has not, and that damages exist. *See Ex parte Am. Heritage Life Ins. Co.*, 46 So.3d 474, 477 (Ala. 2010). Regarding the confidentiality provision, the parties do not dispute whether Dengate and Johnson Controls had a contract or whether Johnson Controls performed its obligations. Rather, the dispute centers on whether Dengate performed his obligations

under the employment agreement. In the agreement, Dengate promised not

to use, copy, or disclose Johnson Controls' confidential information:

> For a period corresponding to the term of employment and
> thereafter, as long as the information remains confidential or
> proprietary, I shall not disclose to others, copy or use, except as
> authorized by Johnson Controls, any confidential or proprietary
> information of Johnson Controls or its subsidiaries and affiliates
> compromising any data or information, however embodied,
> acquired or created, concerning any aspect of the business of
> Johnson Controls that I may acquire or originate during my
> employment.  This clause is not to be construed as prohibiting
> the use of my trade and professional skills so long as such does
> not violate confidential or proprietary information. . . .

(Doc. 34 at 1.)

Johnson Controls points to five categories of protectable confidential

information that Dengate has disclosed to McQuay and used while employed

at McQuay in violation of the agreement: product development, pricing

margins, customer relationships, marketing strategies, and employees' skills

and customer relationships. (Doc. 25 at 6-13.)

The confidentiality of Johnson Controls' product development, and

Dengate's knowledge of it, presents a close question. However, due to this

Court's conclusions concerning the remaining categories, it is not necessary

to discuss these areas.

One issue that does warrant discussion here is the matter of pricing margins. Pricing margins are the percentile difference between Johnson Controls' costs associated with a project—for example, labor and materials—and the price quoted in a bid to Caddell or other contractors. As Defendants' counsel admitted, "the internal margins for the company would generally be considered to be confidential information by them, particularly." (Doc. 26-3 at 60.) Indeed, the parties have designated profit margins as "attorneys' eyes only." (Doc. 22-4 at 33.)

After his transfer to Nashville, Dengate discussed margins on embassy projects with Newton.  This, along with the information on margins he already possessed, supplied Dengate with what he needed to undercut Johnson Controls once he began working with McQuay. (Doc. 25 at 7.)  While in Nashville, Dengate remained interested in how the "embassy jobs were going, how competitive the market was getting." (Doc. 22-4 at 14.) In these discussions for example, Dengate wanted to know "whether the projects were still as rewarding to Johnson Controls as they had been in the past in terms of what kind of margin [Johnson Controls was] able to sell the projects at . . . ." (Doc. 22-4 at 14.)  The two also discussed specific

builders in the embassy market and the specific projects of these builders. Newton and Dengate "discussed where the most recent job [Newton] had gotten with Harbert had been marginwise, where the most recent job [Newton] had lost with Harbert had been marginwise. . . ." (Doc. 22-4 at 33.) With regard to Caddell's projects, Newton and Dengate discussed "what kind of margin level" would need to be bid to "secure a project." (Doc. 22-4 at 17.) The two also talked about general bidding strategies for the SDDR and the KA embassy projects. In sum, Dengate held confidential information regarding Johnson Controls' pricing margins that he obtained as an employee of Johnson Controls.

Dengate then breached his confidentiality provision by using and disclosing this confidential information while working for McQuay. Dengate submitted a bid on McQuay's behalf to Caddell for the SDDR contract. Dengate knew the pricing margins that Johnson had utilized on recent bidding, and knew the margin level Newton thought competitive for the Caddell projects. Newton submitted Johnson Control's bid to Caddell for the SDDR contract. Caddell awarded the SDDR contract to McQuay. Defendants concede that Caddell based its award on few factors, one of those being

price.

Dengate's use of customer relationships also formed an integral part of this process. Dengate's employment with Johnson Controls provided him with close connections with some of Johnson Controls' customers, including people at Caddell, with whom he had been hunting and fishing. Such relationships, cultivated on behalf of one's employer, constitute a protectable interest on behalf of the employer. *See Roberson v. C.P. Allen Const. Co., Inc.*, 50 So. 3d 471(Ala. Civ. App. 2010) (finding the the development of a "close relationship with clients" constitutes a protectable interest)(quoting *DeVoe v. Cheatham*, 413 So. 2d 1141, 1143 (Ala. 1982)). *See also Parker v. EBSCO Indus. Inc.*, 209 So. 2d 383, 386 (Ala. 1968)("Employments which involve acquisition by the employee of confidential knowledge and acquaintance with the employer's clientele are regarded as peculiarly appropriate to restrictions against the use of such knowledge in competition with the employer.") (quoting *Hill v. Rice*, 67 So. 2d 789, 793 (Ala. 1953)). Defendants assert that Dengate's time in Nashville rendered Dengate's contacts "obsolete" by the time he started work for McQuay. The Court is not convinced, however, that customer relationships

have as short a shelf life as Defendants suggest. The record indicates that it was only after meeting with Brian Coltey, with whom Dengate had previously met with approximately once a month, and with whom he had developed a "strong working relationship," (Doc. 22-7 at 8) that Dengate began putting in motion the steps to creating McQuay's embassy air handling unit.

Johnson Controls has established a substantial likelihood of success on its breach of contract claim. The evidence suggests that Dengate breached the confidentiality provision in his employment contract by using his personal contacts and knowledge of Johnson Control's confidential pricing margins to position McQuay's bid. The evidence, in addition, indicates damages. Caddell received bids from McQuay and Johnson Controls for the SDDR contract — not Trane, not any other competitors. Without McQuay's bid, Johnson would have potentially been the lone bidder. Dengate's breach continues to pose a threat to Johnson Controls' relationship with Caddell and its position in the market.

2.    Tortious Interference Claim

Johnson Controls' request for injunctive relief against McQuay is based

on a claim of tortious interference with a business relationship; namely, interference with the relationship that existed between Johnson Controls and Caddell.[2] Although several aspects of Alabama's recognition of this tort were for years beset by confusion and contradiction, a 2009 decision by the Alabama Supreme Court has brought some much-needed clarity, and overruled many inconsistent cases in the process. As it now stands, "properly stated, the elements of the tort are (1) the existence of a protect[a]ble business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). Once a prima facie case has been met, the burden then shifts to the defendant to establish the affirmative defense of justification. *Id.* at 12.

---

[2]An arguably stronger basis for supporting tortious interference might have been to focus on the existing contractual relationship between Johnson Controls and Dengate. *See, e.g, James S. Kemper & Co. Southeast, Inc. v. Cox & Associates, Inc.*, 434 So.2d 1380, (Ala.1983) (finding–even under an older, more restrictive tortious interference regime–that damages against a new employer for tortious interference with a previous employment agreement is "only appropriate"); *see also Roberson v. C.P. Allen Const. Co.*, 50 So.3d 471, 477-78 (Ala.Civ.App. 2010). However, as Johnson Controls' pleading of tortious interference addresses only the relationship between Johnson Controls and its customers, and particularly Caddell, the Court restricts its analysis accordingly.

i. Prima Facie Case

The first element, the existence of a protectable business relationship, does not require an existing contract. "In Alabama, protection is appropriate against improper interference with reasonable expectancies of commercial relations even where an existing contract is lacking." *White Sands Group*, 32 So. 3d at 14. The presence of a "relationship based on a reasonable expectation of commercial benefit" is enough to satisfy the requirement. *Id.* at 16. In fact, Defendants have relied on this very point in their insistence that Caddell be joined as a party, saying that "although a formal contract has yet to be executed, Caddell's interest in its business relations with McQuay certainly merits protection." (Doc. 26 at 4.) Likewise, Johnson Controls had ample reasons to justify a "reasonable expectation of commercial benefit" in its relationship with Caddell when it submitted the SDDR bid. Since 2002, Caddell has consistently relied on Johnson Controls to supply embassy air handling units. (Doc. 22-7 at 5.) Earlier in 2011, Caddell had awarded two bids to provide embassy air handling units to Johnson Controls. (Doc. 22-3 at 39.) In fact, with only a single exception, Caddell awarded every one of its embassy air handling unit contracts to Johnson

Controls from 2002 until the time that Johnson Controls submitted its SDDR bid. As such, there was undoubtedly a "protectable business relationship" as defined by Alabama law.

The second element, requiring a defendant to know of this relationship, is not disputed. Neither party denies that Dengate and McQuay knew about Johnson Controls' position in the market for embassy air handling units in general, or with Caddell in particular.

The third element requires that the Defendant be "independent of or a stranger to the relation." *MAC East, LLC v. Shoney's*, 535 F.3d 1293, 1296 (11th Cir. 2008). This requirement was recently emphasized in the Alabama Supreme Court's explanation of the tort, *see White Sands,* 32 So. 3d at 14 ("In the process of defining the tort of wrongful interference with a business relationship, we deem it prudent to reiterate that one of the elements is that the defendant be a *stranger* to the relationship.") This does not simply mean that the defendant cannot be a party; the requirement is also not met where either: "(1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3)

the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract or relations." *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1156 (Ala.2003)). None of these situations are implicated here. McQuay was not a party to the previous contracts between Johnson Controls and Caddell, whose relationship also did not depend upon McQuay. McQuay was not a "participant" in the sense of being either "essential" to the relationship or part of an "interwoven contractual arrangment" involving it. *Id.* at 1157. Additionally, McQuay would certainly not have benefitted economically if Johnson Controls had been awarded the contract. McQuay was thus a complete stranger to the business relations between Johnson Controls and Caddell.

The fourth element of a plaintiff's *prima facie* case is the defendant's intentional interference with the plaintiff's protectable business relationship. The Court finds a substantial likelihood of this element being satisfied as well. Defendants concede that McQuay had never bid on embassy projects involving the specialized air handling units before

Dengate's arrival. (Doc. 26-3 at 29-30.) McQuay hired Dengate knowing of his previous employment with Johnson Controls, and of the relationship between Johnson Controls and Caddell. Further, McQuay knew that Dengate signed an employment agreement with Johnson Controls, and it even retained a copy of that agreement. (Doc. 22-5 at 15.) Yet, knowing all this, McQuay still used Dengate to submit a bid on the SDDR project, interfering with Johnson Controls' reasonable expectation of commercial benefit.

The final element, damage, is apparent enough. The SDDR contract alone has been valued at around $2 million. As noted above, Johnson Controls apparently would have been the lone bidder—and therefore the winner—of the SDDR contract, absent McQuay's participation. The history between Johnson Controls and Caddell indicates a substantial likelihood of Johnson Controls obtaining the contract had McQuay not interfered. Even if this were not the case, however, Johnson Controls "need not establish that 'but for' the interference it would have been awarded [the] contract." *White Sands,* 32 So. 3d at 17 (internal citations omitted). Damage is still evident from the harm to the business relationship itself, including its ongoing effects and impact on the potential for future opportunities. Thus, having met all five

of the elements, Johnson Controls has established a substantial likelihood of success in its *prima facie* claim for tortious interference against McQuay.

### ii. Defense of Justification

If the foregoing elements were alone dispositive, a claim for interference might lurk behind  every instance of competitive behavior. As the very name of the tort implies, relief is limited to instances in which the interference with business relations is wrongful or tortious. As Johnson Controls concedes, "had McQuay developed its own custom air handling unit with biochem filtration and pursued embassy work without Dengate, such competition would be fair." (Doc. 25 at 15.)

Although interference must be wrongful to be actionable, Alabama law puts the  burden of establishing a lack of wrongdoing on the defendant.  *See White Sands Group*, 32 So. 3d at 12 ("[W]e consider it now to be well settled that the absence of justification is no part of a plaintiff's *prima facie* case in proving wrongful interference with a business or contractual relationship. Justification is an affirmative defense to be pleaded and proved by the defendant."). For establishing the defense of justification, Alabama has adopted the Restatement (Second) of Torts § 767 (1979). *See White Sands*

*Group*, 32 So. 3d at 12 (citing *Gross v. Lowder Realty*, 494 So.2d 590 (Ala. 1986)). The approach calls for a factor-driven "balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances." *Id*. (citing *Gross*, 494 So. 2d at 597 n. 3). Thus, if a defendant's interference is unjustified under the circumstances, it is "improper" and "actionable." *Id*. at 13. Notably, the wrongful behavior may be independantly actionable, but it is not required to be — the tort of intentional interference "overlaps other torts," but "is not coincident with them." Id. At 14.

When assessing the wrongfulness of the behavior, a court must look "not simply [to] whether the actor is justified in causing the harm, but rather whether he is justified in causing it *in the manner in which he does cause it*." *Id.* (quoting Restatement § 767 Comment c). Although some Alabama cases have recognized a so-called "competitor's privilege defense," see *Soap Co. V. Ecolab, Inc.*, 646 So. 2d 166, 1370, this defense is best understood as being "merely a 'special application' of the justification factors considered in determining whether the defendants' conduct is not justified or improper." *White Sands Group*, 32 So. 3d at 18.

The factors to be considered include the actor's motive, the interest interfered with, the interest sought to be advanced by the actor, social interests, proximity or remoteness, and the relations between the parties. Restatement § 767 comment c. However, where the parties to a tortious interference claim "are competitors, 'chief' among the factors to be considered . . . is 'the nature of the defendant's conduct.'" *Id.* (quoting Restatement § 767 comment c). Central to evaluating the nature of McQuay's conduct here is the underlying behavior by Dengate. As discussed above, Dengate violated the confidentiality and non-compete clauses of his employment agreement. This was done, moreover, to further the interests of McQuay.  McQuay was aware of, and even possessed a copy of, the employment agreement between Dengate and Johnson Controls. Dengate violated his agreement with McQuay's full knowledge, and at its behest.

Other courts have found similar conduct on the part of an employer to be wrongful, and to justify injunctive relief. In *CDW LLC v. NETech Corp.*, for example, the court found  that "departing CDW employees clearly had special knowledge of CDW customers as well as their purchasing needs and the pricing arrangments offered them by CDW," and noted that "many of

those employees bore the primary responsibility at CDW for developing CDW's relationships with those customers." 722 F. Supp. 2d 1052, 1061 (S.D. Ind. 2010). The former employees had signed an agreement containing "non-competition, non-solicitation, and confidentiality provisions" similar to the case at bar. *Id.* at 1058. Finding that the violation of these agreements interfered with CDW's business relationships, and that the new employer NETech had knowingly "fostered such interference," the court concluded that CDW had "shown that it [was] likely to succeed on its claim of Tortious Interference" against NETech, and granted injunctive relief. *Id.* At 1063. *See also Ivy Mar Co., Inc. V. C.R. Seasons Ltd.*, 1998 WL 704112 at 16-17 (E.D.N.Y. 1998) (finding that evidence of the defendants' unfair use of companies' customer information, when put to use in competition those companies, gave rise to a finding of "wrongful means").

In light of the factors to be considered, and the context of the circumstances, it appears that McQuay can not meet its burden of establishing that its conduct was justified. Moreover, although the tortious interference claim was raised in the amended complaint and argued for by Johnson Controls in the closing arguments following the hearing (Doc. 25 at

14), Defendants have made no effort thus far to contradict this claim. Thus, the court finds that Johnson Controls has a substantial likelihood of success in its claim for tortious interference against McQuay.

In sum, the Court is satisfied that Johnson Controls has a substantial likelihood of success on the merits as to its claims against Dengate for breach of the non-compete and confidentiality provisions of his employment agreement, and against McQuay for tortious interference. Because these claims are sufficient to support the entry of injunctive relief, the Court finds it unnecessary to consider the remaining claims which Johnson Controls asserts in its amended complaint.

B.    Irreparable Injury.

Johnson Controls asserts that it will lose its competitive advantage in the marketplace. In particular, Johnson Controls contends that it stands to lose five or more contracts with Caddell and goodwill associated with losing other customers. "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  "Although economic losses alone do not justify a preliminary injunction, the loss of customers and goodwill

is an irreparable injury." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 970 (11th Cir. 2005) (citations omitted). Defendants argue that the alleged harm is reparable, and that that any of the five contracts would allow a court to quantify the harm.

But more than quantifiable harm has resulted and will continue to result to Johnson Controls. The harm lies not in damages stemming from individual contracts but rather in the harm to Johnson Controls from having to fight another competitor in the market for embassy air handling units.

The market for embassy air handling units is small. The United States bids out about eight to ten embassies a year. (Doc. 22-4 at 10.) Over a three year period, Caddell bid for between twelve and fifteen of those embassies, winning four or five. Johnson Controls won the bid to supply the air handling units for two, with McQuay being awarded two of the others. Harbert, over a longer time period, won sixteen to eighteen embassy bids, of which Johnson Controls supplied the air handling units for about twelve. Before McQuay's entry this year, Johnson Controls and Trane were—according to Caddell—the only two vendors qualified to provide embassy air handling units. (Doc. 22-7 at 4.) MCQuay was only able to enter the market because

of Dengate's inside information and familiarity with the Caddell representatives who solicit and decide who is awarded bids for such equipment.

Margins in the market sink as the competition increases. Though Trane now wins 25-40% of the bids for air handling units on the Harbert embassy projects, from the early 2000s until the late 2000s Harbert awarded all bids for embassy air handling units to Johnson Controls. (Doc. 22-3 at 39.) Caddell likewise used Johnson Controls exclusively for embassy air handling units until 2009. (Doc. 22-7 at 5.) At the same time, margins—after hovering around 22% for years—tumbled to 15-17%. (Doc. 22-4 at 33-34.) Years after margins began to tumble, the parties provide no evidence to pinpoint the exact fall, only evidence to suggest a fall to somewhere between 15-17%. A third competitor will shrink margins. Because the parties provide no evidence suggesting that hindsight allows them to peg the fall in margins created by a second serious competitor, the harm yet another competitor will bring also escapes quantification.

McQuay's entry effectively doubles Johnson Controls' competition and will likely send margins tumbling further. Quantifying the lingering harm to

profit margins, the decreased chances of winning bids will prove difficult.

But the harm to goodwill eludes quantification altogether.  The unfair

entrance of a competitor into a niche market will invariably affect the

intangible value of the dominant competitor's position. Allowing McQuay to

accrete experience in building embassy air handling units after gaining an

unfair head start will continue to erode the value of Johnson Controls'

goodwill. Johnson Controls, in sum, has established that it will suffer

irreparable harm, warranting an injunction.

      C.    Balance of Harms.

Injunctive relief would prevent Dengate from using confidential

information about pricing margins on embassy air handling units. Likewise,

McQuay would not be able to utilize Dengate's knowledge of that

confidential information, or his relationships with Johnson Controls'

customers, to compete for embassy air handling unit bids. Neither the harm

to McQuay nor Dengate would outweigh the irreparable harm to Johnson

Controls.

McQuay had not bid on embassy work involving air handling units

before April 2011, when Dengate evidently used confidential information on

pricing margins to bid on the SDDR contract. So injunctive relief, at worst, would place McQuay in the same position it stood in a few months ago. If an injunction is entered and McQuay ultimately prevails on the merits, the injunction will have but delayed its prodigious entry into a market which, just months ago, it had not even set foot. McQuay would still be in a better position than it was before April 2011, as injunctive relief would not affect the pending SDDR contract McQuay has with Caddell. The Court finds that whatever McQuay stands to lose by the entering of the injunction is outweighed by the potential damage to Johnson Controls if the injunction is denied.

The potential harm to Dengate is likewise minimal. Injunctive relief seeks to remedy the harm Dengate caused by breaching his confidentiality and non-competition agreement. The "harm" to Dengate is merely to hold him to his agreement — i.e., not utilize Johnson Controls' confidential information or perform services for Johnson Controls' customers in violation of his contract. Dengate would still be able to work for McQuay with respect to other customers and other types of projects, so long as confidential information is not utilized. Thus, the potential harm to Dengate from the

injunction pales in comparison to the potential harm to Johnson Controls. The Court finds that the balance of harms favors granting the requested injunctive relief.

D.     Public Interest.

Defendants correctly point out (Doc. 21-5 at 68) that "encouraging the provision of necessary goods and services enhances the public interest." *First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F. 2d 1045, 1085 (11th Cir. 1990). The very same paragraph the Defendants quote, however, discusses how "unfettered competition in the market . . . may lead to abuses *hurtful to the public interest*." *Id.* As discussed in relation to the non-compete provision, the public interest is not a unitary ideal, but is often composed of competing interests. The public has an interest, for example,in free competition *and* freedom of contract.

The issuing of an injunction would temporarily reduce competition in the market for embassy air handling units. But this temporary reduction would further other public interests. For instance, the public has an interest in preserving fair commercial practices. The public also has an interest in allowing companies to plan and to invest new markets without worry that

their planning or investment is for naught when a employee decides to go elsewhere. *See, e.g., National Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (stating that "the public has a great interest in upholding and enforcing freely negotiated contracts entered into between employees and their employers") (citations omitted); *Consultants & Designers, Inc. v. Butler Service Group, Inc.*, 720 F. 2d 1553, 1560 (11th Cir. 1983)("[T]he public at large can be expected to gain from the enforcement of this and similar restrictive covenants . . . .") The public does not have an interest in the breaching of enforceable agreements, or in the tortious interference with another's business relations. Under the circumstances of this case, the public interest would best be served by issuing the requested injunction.

      E.    No Unclean Hands.

Defendants contend that Johnson Controls should be denied the equitable relief of an injunction because it has unclean hands. Defendants offer two arguments in support of this: first, because Defendants allege that Johnson Controls encouraged its employees to obtain others' confidential information; second, because Johnson Controls allegedly used a job title for

Dengate that violates Alabama law.

### 1.    Seeking Competitors' Information

It is well established that one seeking equity must himself do equity; indeed,  "no principle is better settled than the maxim that he who comes into equity must come with 'clean hands.'" *U.S. v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005). The unclean hands doctrine mandates that "one who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience." *In re Kingsley*, 518 F.3d 874, 878 (11th Cir. 2008).

Defendants first contend that Johnson Controls has unclean hands because it has allegedly "engage[d] in the same conduct of which it accuses Dengate and McQuay," by encouraging  its employees to obtain confidential information from its own competitors. (Doc. 21-5 at 73.)  It should be noted that the act of seeking information about one's competition is, in and of itself, a perfectly legitimate part of doing business. There is a fine line, however, between gleaning such information through lawful means, and resorting to sponsoring the willful violation of confidentiality and non-compete agreements to obtain it. While the conduct of Dengate and McQuay

appears squarely on the forbidden side of that line, there has been no evidence presented to the court that Johnson Controls has engaged in similar behavior.

Defendants attempt to rely on the deposition testimony of Stan Stanitzke, as well as a Performance Review of Dengate from 2000, in which Dengate was commended for "[e]xceed[ing] expectations in learning competition's products and prices." (Doc. 21-2 at 61.) Nothing in the performance review hints at the use of any wrongful means, however, nor does Stanitzke's testimony. Indeed, when asked by Defense counsel about the expectations referred to in the Performance Review, Stanitzke explained that it referred to the "intuitive" process of "get[ting] a feel for where a particular manufacturer seems to be strong" by carefully noting where one's own bids have historically been won and lost, in conjunction with the information published in the marketplace. (Doc. 21-1 at 37.) Stanizke explicitly stated that Johnson Controls "would not expect [their] salespeople to go obtain confidential information in [sic] a competitor." (*Id.*) Indeed, the very employment agreement which Dengate signed with York in 1999 warned him against doing anything of the kind. It cautioned

Dengate as follows:  "Likewise, EMPLOYER respects the proprietary rights of others and *requires that its employees refrain from disclosing to it confidential information owned by others*." (Doc. 19-1) (emphasis added). There is no evidence that Johnson Controls engaged in behavior akin to Dengate's and McQuay's.

### 2.    Dengate's Job Title

Defendants' second argument, that Johnson Controls has unclean hands because Dengate's job title included the term "engineer" when he was not actually licensed as an engineer (in violation of Ala. Code § 34-11-15) is equally without merit.  Under the doctrine of unclean hands, the plaintiff's own conduct will not bar equitable relief "unless the defendant can show that he has personally been injured by the plaintiff's conduct," *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d  852, 863 (5th Cir. 1979). Equity is not so stringent as to "demand that its suitors shall have led blameless lives" in order to be eligible for relief. *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 658 (5th Cir. 1975) (quoting *Loughran v. Loughran*, 292 U.S. 216, 229 (1934)).  The Court does not find any evidence that Dengate's former job title is at all germane to the present dispute, much less that the

Defendants have been personally injured by the use of the term "engineer."

Accordingly, the doctrine of unclean hands is inapplicable, and does not bar

the equitable relief sought by Johnson Controls.

## V.     Conclusion.

For the foregoing reasons, this Court finds injunctive relief to be

warranted, and grants certain relief sought in Johnson Controls' motion for

a preliminary injunction. (Doc. 34 at 1.) The Court is mindful of the purpose

of a preliminary injunction, to "preserve the status quo and prevent

allegedly irreparable injury until the court ha[s] the opportunity to decide

whether to issue a permanent injunction." *Schiavo*, 403 F.3d at 1262

(quoting *Klay v. United Healthgroup, Inc.*, 376 F. 3d 1092, 1103 n. 13 (11th

Cir. 2004)). In fashioning the terms of the injunction, the Court attempts to

ensure that "the scope of the awarded relief does not exceed the identified

harm." *Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010).  A separate

order will be entered granting injunctive relief consistent with this opinion.

Done this 19th day of August 2011.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
167037